**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:07cv75**

| | |
|---|---|
| In *re*: ) | |
| ) | |
| **JOSEPH A. DEPAULIS,** ) | |
| **SHARON M. DEPAULIS,** ) | |
| ) | |
| **Debtors.** ) | |
| ̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶) | |
| ) | |
| ) | |
| ) | |
| **GERALD HOLLAND,** ) | |
| ) | |
| **Appellant,** ) | |
| ) | |
| **vs.** ) | **MEMORANDUM OF DECISION** |
| ) | **AND ORDER** |
| ) | |
| **JOSEPH A. DEPAULIS, and** ) | |
| **SHARON M. DEPAULIS,** ) | |
| ) | |
| **Appellees.** ) | |
| ̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶) | |

**THIS MATTER** is before the Court on the Notice of Appeal of Gerald

Holland (Holland or Appellant).  [Doc. 1, filed February 13, 2007].

Holland appeals from the Order Confirming Debtors' Chapter 13 Plan

and Denying the Claim of Gerald Holland, signed by United States

1

Bankruptcy Court Judge George R. Hodges on January 30, 2007. [Doc. 1-2, filed February 13, 2007].[1]

## PROCEDURAL HISTORY

On June 6, 2005, Joseph A. DePaulis (DePaulis)[2] and Sharon M. DePaulis filed a voluntary petition pursuant to Chapter 13. [Bky. Doc. 1]. On July 1, 2005, they filed a proposed Chapter 13 Plan. [Bky. Doc. 10]. On August 2, 2005, Appellant Gerald Holland (Holland) filed an Objection to Confirmation of the Plan, arguing that DePaulis owed him "at least the sum of $176,659.17," [Bky. Doc. 16, at ¶2], and that as a result of this claim, DePaulis' "noncontingent, liquidated, unsecured debts" exceeded the $307,675.00 maximum allowed by 11 U.S.C. §109(e). Holland therefore argued that DePaulis was not eligible for Chapter 13 relief. [Id., at ¶¶4-5].

Holland subsequently filed a Proof of Claim, which does not appear

---

[1]The Record on Appeal in this matter has not been submitted in manual form to this Court. Therefore, the Court will refer to the contents of the Record on Appeal by referring to the document numbers filed in the Bankruptcy Court Record; for example, "Bky. Doc. 38," while documents in the Record of this Court will be identified by the designation "Doc." The Order appealed from is found at Bky. Doc. 38 and was filed with this Court as an attachment to the Notice of Appeal at Doc. 1-2.

[2]The dispute at issue involves a debt of Joseph DePaulis only. As a result, reference to DePaulis within the opinion is only to him and not his wife, Sharon. When both Debtors are referenced, they will be referred to as Appellees.

in the Record, but the Debtors objected to the allowance of any claim of Holland, on the grounds that he was not a creditor of DePaulis, but rather of Ceres Group, LLC, a limited liability company owned by DePaulis, and that DePaulis had made no personal guaranty or other undertaking for the debts of Ceres. [Bky. Doc. 27].

Two hearings were conducted by the Bankruptcy Court. The first was held on November 15, 2006, concerning whether the Debtors were eligible for chapter 13 relief under §109(e) based on whether Holland's claim was contingent or non-contingent. [Bky. Doc. 52, filed March 28, 2007]. At the conclusion of that hearing, the Bankruptcy Court concluded that the debt is contingent and thus the Debtors are eligible for Chapter 13 relief.[3] [Id.]. On November 30, 2006, the second hearing was held, this one on DePaulis' objection to Holland's claim and Holland's objection to the plan's confirmation. On January 29, 2007, Judge Hodges entered Findings of Fact and Conclusions of Law upon Objection to Confirmation of Debtors' Plan by Gerald Holland and Debtors' Objection to the Claim of Gerald Holland. [Bky. Doc. 37]. The next day, he entered an order confirming the Plan and denying Holland's claim. [Bky. Doc. 38]. Holland

---

[3] This oral ruling was not made the subject of an Order until January 30, 2007. As a result, Holland's appeal from that ruling was timely filed.

timely appealed.

## STANDARD OF REVIEW

The decision of the Bankruptcy Court is reviewed by a two-step process.  Reversal of the findings of fact of the Bankruptcy Court may occur only where the findings are clearly erroneous.  In re Deutchman, 192 F.3d 457, 459 (4th Cir. 1999).  The conclusions of law of the Bankruptcy Court are reviewed *de novo*.  Id.

Findings of fact are clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  In Re Green, 934 F.2d 568, 570 (4th Cir. 1991), *citing* In Re First Federal Corp., 42 B.R. 682 (Bankr.W.D.Va. 1984).  As stated by the Supreme Court:

> If the [lower court's] account of the evidence is plausible in light of the record viewed in its entirety, the [appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

> On an appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment ... or remand with instructions for

further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Bankr.R. 8013; *accord*,  <u>In re Tudor Associates, Ltd., II</u>, 20 F.3d 115, 119

(4th Cir. 1994).


## EVIDENCE BEFORE THE COURT BELOW

At the November 15 hearing regarding the issue of the eligibility of the Debtors for Chapter 13 relief, no evidence was presented by either party.  The hearing consisted only of arguments of counsel.  The evidence on that issue consists of the record, as stated in the Procedural History above.

The evidence at the November 30, 2006, hearing [Bky. Doc. 38] on the Objection to Holland's claim was as follows.  DePaulis testified that Ceres is a limited liability company formed in 2004 to broker air charter services for NASCAR race teams and DePaulis was its sole owner. [Bky. Doc. at 8].  DePaulis did not have any prior experience in this type of business although he had worked for NASCAR as a brand manager.[4]  [<u>Id</u>., at 8-9].  DePaulis hired attorneys to form and organize Ceres.  Pursuant to

---

[4] A brand manager is responsible for managing a corporate sponsor's relationship with NASCAR.  <u>www.NASCAR.com.</u>

an operating agreement, he was the sole member and manager of the company.  [Id., at 10].  DePaulis acknowledged that a schedule within the operating agreement which would have recorded initial capital contributions to the company was left blank.  [Id., at 11].  He testified, however, that when he started Ceres, he withdrew all of the funds in his pension plan, $130,000.00, for use in the initial air charter services of the business.  [Id., at 39].

DePaulis planned on providing service for the teams participating in three NASCAR race series in 2005: the truck series, the Busch Series and the Nextel Series. [Id., at 13].  The estimate of the cost of providing a full slate of eighty flights to the various races in these series for a full year was approximately $5.6 million. [Id., at 14].  DePaulis testified that this did not require an up-front outlay by Ceres but instead was calculated on anticipated business.  [Id., at 15].  In order to break even, DePaulis estimated that he would need to have each plane filled to at least seventy-five percent capacity.  [Id.].  The business was structured such that Ceres would be paid by the NASCAR teams within thirty days after the flights. [Id., at 24].

During its short existence Ceres provided the flights for only three trips between November 2004 and March 2005.  For the first of these

DePaulis estimated that the cost of the charter would be around $55,000.00.  [Id., at 17].  In order to pay this DePaulis borrowed money from a line of credit secured by his home.  [Id.].  He considered this a loan to Ceres. [Id.].  DePaulis acknowledged that the company did not have the funds on hand to pay for that first flight.  [Id.].  In fact, in order to attract business, DePaulis offered a flat rate of $500 per seat to fly NASCAR teams to races all season in three specific areas of the country.  [Id., at 17-18].  Ceres lost about $44,000.00 on the first flight because only twelve team members signed up for the flight.  [Id., at 19].

The second flight was to Daytona Beach, Florida in February 2005. [Id., at 19-22].  Although DePaulis had estimated the cost would be around $50,000.00, the actual cost ended up being $107,000.00.  [Id.].  DePaulis testified that he expected to lose money during the first year as he tried to build up business among the NASCAR teams.  [Id., at 22].  In order to pay for the second flight, DePaulis used lines of credit, took out a second mortgage on his home and withdrew money from his pension plan.[5] [Id.]. He borrowed almost $60,000.00 against the equity in his home.  [Id., at 39].  Again, the money was loaned to Ceres.

_____

[5] It is difficult to square this testimony with Mr. DePaulis' earlier testimony that he withdrew all of the funds from his retirement account at the time of the formation of Ceres. [Id. at 39].

DePaulis testified that he never had an agreement with Holland whereby Holland would advance money to Ceres. [Id., at 26]. In fact the arrangements with Holland were made by Alan Winninger, a consultant used by Ceres who knew Holland. [Id., at 31-32]. DePaulis testified that he "never had a conversation with Mr. Holland about advancing the money to the air charter companies." [Id., at 32]. As far as DePaulis knew, Holland never made any investigation into Ceres before reaching his agreement with Winninger. [Id., at 40]. There was no promissory note or any signed credit agreement of any type. [Id., at 41]. DePaulis did not sign any personal guaranty. [Id.]. Holland did not request or receive any financial statement from Ceres' accountant. [Id.].

Holland was willing, however, to send money directly to the air charter companies to enable Ceres to use their planes, provided that Holland received in advance two post-dated checks from Ceres in the amount of money advanced plus ten per cent interest. [Id., at 27, Doc. 16]. DePaulis wrote those checks on Ceres' bank account, signed them and sent them to Holland. [Id.]. As the other condition of advancing the funds, Holland was to be paid from the accounts receivable collected from those flights; that is, within thirty days of the advance. [Id.]. DePaulis sent Holland by facsimile accounts receivable listings to show the amounts due

Ceres for the flights.  [Id., at 32].

Holland wired $54,000.00 to Air Tran to pay for half of the California flight. [Id., at 28].  DePaulis paid for the return flight at a cost of $95,000.00 by using his personal credit card.  [Id., at 29].  DePaulis also paid $29,000.00 for a flight in March 2005 which he charged to a credit card. [Id., at 31].  For the balance of this charter Holland wired $102,000.00 into the account of Miami Air.  [Id., at 33].

The March 2005 flight was the last flight serviced by Ceres which stopped doing business shortly thereafter.  After Ceres went out of business, some of the NASCAR teams paid their accounts receivable.  [Id., at 30].  Holland was not paid from those accounts receivable. [Id.].

DePaulis testified that he continued to use money in Ceres' bank account after the company stopped doing business.  [Id., at 34].  He also admitted that shortly after Ceres stopped doing business, he took a business trip to California and used money in the Ceres bank account to pay for the trip.  [Id., at 35]. The trip had nothing to do with Ceres as DePaulis was looking for a job. [Id.].  DePaulis testified that he had never taken a salary from Ceres and therefore he withdrew sums for personal cash. [Id.].  DePaulis had never taken any bonuses or dividends from Ceres and in fact, had never received any reimbursement. [Id., at 41].

Funds in the Ceres bank account were also used for personal matters such as a chiropractor's visit, as well as charges on his personal credit card, even though there is no evidence whether the charges were personal or related to Ceres. [Id., at 36-37]. DePaulis also used Ceres funds to pay for trips to Texas and Illinois to look for a job and for expenses at a Las Vegas casino in October 2005. [Id., at 37].

Before Ceres stopped doing business, it was paid some funds on its accounts receivable; however, these funds were used to pay Winninger and other expenses associated with the business. [Id., at 40]. Although Holland's attorney has argued in its brief that DePaulis used over $70,000.00 of Ceres' money for personal benefit, there is no support for this amount in the Record. Holland may be relying on certain exhibits introduced during the hearing to support this claimed amount, but those exhibits have not been placed before this Court. The transcript of the hearing was filed in the Bankruptcy Court record, but the exhibits introduced there were retrieved by the attorney for the Appellant and were not scanned into the record. [Bky. Doc. 34, filed November 30, 2006]. Therefore these cannot form a basis for this Court's determination in this matter.

After Ceres stopped doing business, DePaulis invested additional

funds in the company. [Bky. Doc. 53 at 41-42].  DePaulis testified that throughout the company's existence, he consistently deposited his personal funds into Ceres' bank account . [Id., at 42-44].  There is no evidence in the record from which a calculation can be made as to whether or not these additional deposits during the winding up period exceeded the amount of any personal expenditures by DePaulis from Ceres funds.

Ceres filed for bankruptcy in May 2006, some eleven months after DePaulis.  [Id., at 34].  Holland has been listed as a creditor and has a claim pending in that matter.

Alan Winninger also testified at the November 30 hearing.  According to Winninger, DePaulis had financial and management control over the Ceres. [Id., at 50].  Winninger reiterated DePaulis testimony that it would have taken at least a year to build the business.

> The purpose of the [first] flight was to – basically the way the NASCAR teams worked is it is pretty much a "follow me" sport, and we had to show the teams that we had the ability and the initiative to be a competitor and give them an option and a choice for their flight needs.  So we did the [first] flight at very reduced – at cost option to the teams so they could experience the service, so they would be able to see the difference from what they were currently using.

[Id., at 53].

Winninger introduced DePaulis to Holland whom Winninger knew

from past business associations.  [Id., at 56].  It was Winninger who

suggested to Holland that he provide funding for Ceres.  [Id.].  There had

been some discussion about Holland ultimately becoming a part owner of

the company.  [Id.].  Winninger negotiated the loan terms with Holland.

[Id.].  Winninger testified that he believed that DePaulis intended to repay

Holland as promised.  [Id., at 59].  Winninger described the arrangement

as "a gentlemen's agreement."  [Id., at 60].

> On these facts the Bankruptcy Court found that
>
> DePaulis put almost all of his assets into the Ceres in an attempt
> to make the business succeed.  He did not attempt to hide behind
> the veil of the limited liability company and thereby shield his
> assets from the creditors of Ceres.
>
> In winding up the business affairs of the Ceres, DePaulis used the
> assets of the company to pay some of his personal expenses.
> However, in light of DePaulis' salary claims against Ceres (he
> never took a salary from Ceres) and the claims for money
> invested in Ceres, the funds he withdrew or spent for his own
> benefit during winding up were minimal.

[Bky. Doc. 37 at ¶18-19].

The Bankruptcy Court further found that "totally absent is any fraud or

dishonest or unjust acts, or any misrepresentation." [Bky. Doc. 53 at 80].

Based on these findings the Bankruptcy Court concluded as a matter

of law that "Gerald Holland has not proven the factors necessary to find the

Debtor individually liable for the debts of the Ceres Group." [Bky. Doc. 37 at

¶[33].  It is from this determination that Holland appeals.


**DISCUSSION**

**Eligibility Under 11 U.S.C. §109(e)**

The threshold question presented is whether the Order of the Bankruptcy Court must be vacated because the Debtors are ineligible to file under Chapter 13.  Section 109(e) of the Bankruptcy Code states that one may file a petition under Chapter 13 only if the debtor's "noncontingent, liquidated, unsecured debts" do not exceed $307,675.00.[6]

The debts of the Debtors are such that if the claim of Appellant Holland must be included in the calculation of "noncontingent, liquidated, unsecured debts" then the Debtors are not eligible, and their Petition should have been dismissed.  If, however, Holland's claim does not fall within this definition, then the Debtors may maintain their Chapter 13 proceeding.  The Bankruptcy Court concluded that Holland's claim was contingent, and thus was properly excluded from the §109(e) calculation. [Bky. Doc. 37 at ¶26].

The parties do not dispute that Holland's claim against DePaulis is

_____

[6] The amount is now $336,900.00, but the amount of $307,675.00 is the amount that was applicable as of the date of the filing by the Debtors herein.  11 U.S.C. §109(e).

liquidated and unsecured. [Doc. 5 at 5][Bky. Doc. 37 at ¶ 25] .  The only

issue is whether it is contingent.

The Bankruptcy Court held that

[T]here is no right to collect against an individual unless you are successful in establishing a legal right to pierce the corporate veil, which is unusual and not an ordinary kind of proceeding.  So it is contingent essentially on the establishment of a legal right.

[Bky. Doc.53 at 13], and that

[T]he liability of DePaulis will not arise, if at all, until some court finds that the veil should be pierced and DePaulis found liable to Holland.  None of this had occurred as of the date of the petition. While it is true that Holland had filed a lawsuit against DePaulis, that lawsuit had not gone to final judgment as of the date of the petition and Holland had made no claim in that suit that DePaulis should be liable to him under a piercing the veil theory.  Holland merely asserted a direct claim against DePaulis, which he has now abandoned.  The claim of Holland is clearly a contingent obligation which cannot be used in the calculations required under Section 109(e).

[Bky. Doc. 37 at ¶26].  From that determination Holland appeals.

It is first noted that the question of whether a debt is contingent or

noncontingent for purposes of §109(e) is a matter of law subject to *de novo*

review on appeal.  In re Soderlund, 236 B.R. 271 (9th Cir. BAP 1999).

As used in §109(e), "the term 'debt' is sufficiently broad to cover any

possible obligation to make payment, whether that obligation is ... fixed or

contingent, disputed or undisputed and whether or not it is embodied in a

judgment." In re Mazzeo, 131 F.3d 295, 302 (2nd Cir. 1997).

> It is generally agreed that a debt is contingent if it does not become an obligation until the occurrence of a future event, but is noncontingent when all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy. "A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event ... [A] creditor's claim is not contingent when the 'triggering event' occurred prior to the filing of the chapter 13 petition." Thus, a contingent debt is "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger ... liability."

Id., at 303, quoting Brockenbrough v. Commissioner, 61 B.R. 685, 686-87 (W.D.Va. 1986). See also, In re All Media Properties, Inc., 5 B.R. 126, 133 (Bankr., S.D.Tx.,1980).

"The statute as enacted by Congress mandates that the debts which the debtor may exclude from computation of the §109(e) eligibility are contingent and unliquidated debts. The statute does not exclude disputed debts." In re Claypool, 142 B.R. 753, 754 (Bankr., E.D.Va. 1990). "'[E]ven a bona fide dispute over liability for a claim does not make the debt contingent.'" Mazzeo, 131 F.3d at 303, quoting In re Nicholes, 184 B.R. 82, 89 (9th Cir. BAP 1995). DePaulis listed Holland on his schedules as a creditor, if only "for notice purposes."[7] [Bky. Doc. 9 at 14]. By doing so

---

[7] At least one other creditor of Ceres, Air Tran Airways, is listed in the schedules in a similar fashion. No argument is made that the Claim of Air Tran should be included in the §109(e) total.

DePaulis acknowledged that Holland was asserting a claim against him for the debt of Ceres. "Debts of a corporation listed on an individual debtor's schedules are not rendered contingent simply because the individual debtor's liability for the corporation's debts is at issue." In re Nicholes, 184 B.R. at 89. If "the acts which may give rise to the debtor's personal liability for the corporation's debts occurred prior to the filing of the petition, no future event need occur to impose liability. The debts are ... not contingent." Id.; Mazzeo, 131 F.3d 295; Claypool, 142 B.R. 753.

Holland argues that all the events giving rise to Ceres liability to him occurred prior to the filing of the Debtors' petition, and that the actions giving rise to Holland's claim to pierce the veil and hold DePaulis personally liable for those debts also occurred prior to filing.[8] Holland therefore argues that Mazzeo, Nichols and Claypool dictate that his claim against DePaulis is not contingent as of the date of filing and should be counted.

Appellant's argument, however, stops short of fully analyzing the issue at hand. First it should be noted that the only ground on which

---

[8] It is noted, however, that some of the most significant events that Holland points to, such as the use of Ceres funds to pay expenses at the casino during the Las Vegas job search trip, occurred some four months *after* the Debtors filed. [Bky. Doc. 53 at 37].

Holland claims that DePaulis is personally liable is a "piercing the veil" or "instrumentality" theory. [Bky. Doc. 53 at 72-76]. Though he may have originally asserted a claim against DePaulis on a direct theory of liability [Bky. Doc. 16], this was abandoned prior to the hearing in Bankruptcy Court on the §109(e) issue. [Bky. Doc. 37 at ¶26, Bky. Doc. 52]. Likewise, Holland abandoned any argument that he may have had for breach of fiduciary duty or constructive fraud in order to stipulate that the claim was liquidated.[9] Holland argued only the "piercing the veil" theory below. [Bky. Doc. 53 at 72-76].

In analyzing "piercing the veil" claims, the Courts have held that since they are in the nature of tort claims that they are to be considered contingent, even though the underlying claims for which liability is asserted may be in contract. For instance in <u>In re Blehm</u>, 33 B.R. 678 (Bky. Ct., D.Col., 1983), the court was faced with facts virtually identical to those herein, with the creditor presenting a claim that the debtors should be personally liable on a theory of piercing the corporate veil, and that upon the assertion of such claim the debtors were over the §109(e) limit. After

---

[9] It is not disputed that a tort claim, including one for constructive fraud or breach of fiduciary duty, would not be considered a liquidated claim for the purposes of applying §109(e). <u>In re Robertson</u>, 143 B.R. 76, 79 (Bky. Ct., N.D. Tex., 1992); <u>Denham v. Shellman Grain Elevator, Inc.</u>, 444 F.2d 1376, 1380 (5th Cir. 1971).

discussing the definitions, qualities and characteristics of contingent versus non-contingent claims, the court held

> [I]t is clear that "veil-piercing" claims against these individual defendants do not fit exactly on one side or the other [of the divide between contingent and non-contingent claims]. On the one hand, if liability is established, the amount of damages would be easy to determine from the underlying contracts or notes or whatever agreements the creditor entered into with the corporation. In this respect, ["veil-piercing"] claims are like the classical non-contingent claims of breach of contract or default on notes.
>
> But, on the other hand, the plaintiff must prove elements justifying the veil-piercing in the first place in order to establish the Debtors' liability. In this respect, it is like a tort claim, where the plaintiff must first establish negligence. It seems to this Court that veil-piercing is *more* like a tort claim than a contract claim. In a sense, it is a remedy for a type of fraud perpetrated on the creditors. This Court concludes, therefore, that the veil-piercing claims are contingent and should not be included in the §109(e) computation. Thus, the Debtors in this case are eligible for Chapter 13 treatment under §109(e).

Id. at 680 (emphasis in original).[10] Another case on virtually identical facts is

In re Robertson, 143 B.R. 76 (Bky. Cy., N.D. Tex., 1992), which likewise holds

"veil-piercing" cases to be contingent and any such claim to be excludable

from the §109(e) computation, citing Blehm and Denham v. Shellman Grain

Elevator, Inc., 444 F.2d 1376, 1380 (5th Cir. 1971)(decided under pre-1978

---

[10] The Court notes that the Appellant cited Blehm for the proposition that disputed debts are to be included in the §109(e) computation, but failed to mention the holding of the case.

Act).  See also, <u>In re Odette</u>, 347 B.R. 60 (Bky. Ct., E.D. Mich., 2006).

The Court finds <u>Blehm</u> and <u>Robertson</u> to be persuasive.  If veil piercing cases were to be treated as non-contingent, then every Chapter 13 debtor who owned a controlling interest in a corporation or limited liability company would be subject to having his eligibility to file under Chapter 13 challenged simply by the assertion of such a claim, whether or not the claim is well founded.  As the court noted in <u>In re Odette</u>, 347 B.R. 60 (Bky. Ct., E.D. Mich., 2006)

> It is worth noting that it is not unusual for shareholder(s) or members or partners of relatively small corporate or limited liability type entities who individually file for bankruptcy (and their often defunct entities do not) to list on their bankruptcy schedules, in addition to their own clearly individual debts, the outstanding debts of those entities - at least those which they have not by binding agreement specifically individually guaranteed and which thus, by contract, have become individual liabilities.  Presumably, they are counseled to do so out of caution and/or an understandable concern they might actually be or be held to be individually liable for those debts and they desire to discharge such liability through the individual bankruptcy.

<u>Id</u>. at 63.  If the Court were to adopt the Appellant's view of §109(e), it would put every such Chapter 13 debtor in the position of choosing whether the eschew such protections to which he is entitled in order to have greater assurance that he will be allowed to proceed under Chapter 13.  Also, if such were the law the Bankruptcy Court would be put in the

position of being required to conduct "piercing the veil" hearings at a very early stage of many Chapter 13 proceedings in order to determine eligibility, even when such issues may often turn out to be unnecessary for the administration of the claims in the estate.

For this reason the court below was correct in holding that

[T]here is no right to collect against an individual unless you are successful in establishing a legal right to pierce the corporate veil, which is unusual and not an ordinary kind of proceeding. So it is contingent essentially on the establishment of a legal right.

[Bky. Doc.53 at 13]. Proving a claim by piercing the veil is and should be a rare event. Therefore, the mere assertion of a veil-piercing claim must be held to be contingent for the purposes of §109(e).

As to the eligibility of the Debtors to proceed under Chapter 13 and whether the claims against them exceed the maximum of 11 U.S.C. §109(e) the Judgment of the Bankruptcy Court is affirmed.


**Objection to Holland's Claim**

Since the Debtors have been held to be entitled to proceed with this Chapter 13, the Court must next address Holland's appeal from the Bankruptcy Court's sustaining of the objection to his claim. The Bankruptcy Court made the following findings of fact in this regard:

> In winding up the business affairs of Ceres, DePaulis used the assets of the company to pay some of his personal expenses. However, in light of DePaulis' salary claims against Ceres (he never took a salary from Ceres) and the claims for money invested in Ceres, the funds he withdrew or spent for his own benefit during the wind up were minimal. In short there was no looting of Ceres by DePaulis.

[Bky. Doc. 37 at ¶19].

Appellant makes an exceedingly brief, one paragraph argument that DePaulis should be personally liable to him because he breached a fiduciary duty to him. [Doc. 4 at 8]. It is clear from the transcript of the November 30, 2006, hearing, however, that the Appellant abandoned the breach of fiduciary duty claim in favor of arguing only a piercing the veil theory. [Bky. Doc. 53 at 72-76]. It would appear that this was done in order to avoid the obvious inconsistency between the breach of duty claim and the position that Appellant took with regard to the Debtors' eligibility under §109(e). Nonetheless, Appellant presents this issue here. This, Court, however, sitting in an appellate capacity, should refrain from entertaining on appeal issues not raised and addressed in the court below. Singleton v. Wulff, 428 U.S. 106, 121, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976).

Moreover, as previously noted, Holland claims that DePaulis used over $70,000.00 of Ceres' money during the wind up period for personal gain. [Doc. 4, filed April 16, 2007, at 7]. This argument is apparently based

on March 2005 bank statements and charges which have not been placed

before this Court.  In his brief, Holland cites repeatedly to deposition

testimony and exhibits introduced at the hearing in Bankruptcy Court but

he has failed to place those items in the record.  Moreover, the transcript of

DePaulis' testimony during that hearing does not disclose any such

specific amounts and supports no such conclusion with regard to the wind

up period.  Holland's failure to provide the exhibits, which he designated as

part of the record on appeal, normally would result in a summary

affirmance of the Bankruptcy Court.  See,  Anstine v. Centex Home Equity

Co., LLC, 339 B.R. 756, 761 (10th Cir. BAP 2006) (failure to include

exhibits from trial will result in summarily affirming); Cline v. Cline, 259

Fed.Appx. 127 (10th Cir. 2007), *certiorari denied* 128 S.Ct. 2504 (2008)

(although appeal would not be dismissed, failure to include exhibits would

result in affirming court below); In re Kennedy, 249 F.3d 576, 579 (6th Cir.

2001); In re Cambio, 353 B.R. 30, 36 (1st Cir. BAP 2004).

    In his Appellee's Brief, however, DePaulis argues from the same

missing bank statements.  Though Holland argues that they show personal

use of $70,000 of Ceres' funds, DePaulis argues that they show that he

spent $4,666.64 of Ceres funds "on personal expenses while winding up

the company." [Doc. 5, filed May 4, 2007, at 4].  Of course, DePaulis' brief

suffers from the same infirmity as Holland's in that the record does not contain the actual exhibits showing the amount, and thus the Court cannot make any calculations therefrom. Nonetheless, during his testimony before the Bankruptcy Court, DePaulis candidly admitted he used company funds during the wind up period, although again, the record does not disclose the amount. In fact, the record does not disclose whether such funds exceeded the amount of personal funds that DePaulis used to pay company debts during that same wind up period. [Bky Doc. 53 at 41-44]. On this evidence Holland argues that Bankruptcy Court's finding was clearly erroneous. [Doc. 4 at 9]. On the contrary, however, the very thin record that is before this Court regarding the funds taken out of and contributed to the company by DePaulis during the winding up period, are sufficient to support this finding.

Turning to the Appellant's primary argument, he asserts that the Bankruptcy Court erred in sustaining the objection to his claim that DePaulis should be personally liable on a piercing the veil theory. Appellant correctly states the elements of the "instrumentality rule" applied under North Carolina law for piercing the veil of a corporation as follows:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that

the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Glenn v. Wagner, 313, N.C. 450, 455, 329 S.E.2d 326, 330 (1985), quoting

B-W Acceptance Corp. v. Spencer, 268 N.C. 1, 9, 149 S.E.2d 570, 576

(1966). The Appellant cites no authority for the proposition that this

"instrumentality rule" is applicable to limited liability companies (which are not

corporations), and the Court is unaware of any cases decided under North

Carolina law deciding the extent to which the rule may be applicable. In the

face of the absence of such authority the Court will conclude that the

"instrumentality rule" as enunciated in Glenn is a fair guide for the proof

required to disregard a limited liability entity formed pursuant to N.C. Gen.

Stat. Chapter 57C.

The Appellant assigns error to only one of the Bankruptcy Court's

findings of fact, which relates to the "instrumentality rule." That finding is as

follows:

There was no misrepresentation by DePaulis regarding the

invoices delivered to Holland nor was there any fraud, dishonest or unjust acts committed by DePaulis to the detriment of Holland, nor did DePaulis make any misrepresentations to Holland.

[Bky. Doc.37 at ¶21].

Appellant argues that

[T]his finding is clearly erroneous because the Debtor testified that he personally told Appellant that Appellant's loan would be repaid from the collection of the Ceres accounts receivable. The Debtor's failure to pay Appellant from the collection of those accounts receivable can be nothing but a misrepresentation.

[Doc. 4 at 14]. Appellant, however, misperceives what a misrepresentation is. A promise to pay, even a promise to pay from a particular source at a particular time is not a misrepresentation, it is a promise. The failure to pay when promised is not a misrepresentation, it is a breach of that promise. A misrepresentation must be an incorrect statement of a past or subsisting fact. See, Overstreet v. Brookland, Inc., 52 N.C. App. 444, 452, 279 S.E.2d 1, 20 (1981). If DePaulis actually or impliedly misrepresented that he had the intent to pay when he, in fact, had no intent to pay, that would be a misrepresentation. As Appellant cites [Doc. 4 at 14], if there is a promise to pay accompanied by an actual or implied representation that the promissor has the ability to pay, when the promissor, in fact, has no such ability, then that is a misrepresentation. The Bankruptcy Court, however, found as fact that no misrepresentation had been made to Holland. [Bky. Doc. 37 at ¶21].

The evidence shows that when the promise to pay was made to Holland, it was supported by the print out of receivables that would show a reasonable expectation of ability to pay on the part of DePaulis. The Appellant's own witness, Winninger, testified that he believed that DePaulis had the intention to pay. [Bky. Doc. 53 at 59]. There was evidence to support this finding and it is not clearly erroneous.

The Appellant lastly takes issue with the Bankruptcy Court's legal conclusion that Appellant "has not proven the factors necessary to find the Debtor individually liable for the debts of the Ceres Group and his claims should be denied." [Doc. 4 at 15, Bky. Doc. 37 at ¶33]. The evidence presented, however, supports the Bankruptcy Court's conclusion that the Appellant failed to show any of the three elements of the "instrumentality rule." The evidence showed that DePaulis was sufficiently mindful of the separate existence of Ceres that he continued to contribute personal funds to pay Ceres' debts even though Ceres had discontinued business and no longer had any ability to earn revenue. [Bky. Doc. 41-44]. The Bankruptcy Court found and the evidence supports that the Debtor did not act dishonestly or fraudulently, but rather that he poured virtually his entire net worth into a business venture that failed. [Bky. Doc. 37 at ¶18].

For these reasons the Judgment of the Bankruptcy Court sustaining the

objection to the debt of Appellant Holland is affirmed.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Order Confirming Debtors'

Chapter 13 Plan and Denying the Claim of Gerald Holland [Bky. Doc. 38] is

hereby **AFFIRMED**.

Signed: September 26, 2008

Martin Reidinger
United States District Judge